**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CATHRYN THORPE,**<br>**Plaintiff,**<br>**v.**<br><br>**THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC. d/b/a JEFFERSON HEALTH,**<br>**Defendant.** | **Case No. 25-cv-7167-JHS** |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT'S MOTION TO DISMISS**

Cathryn Thorpe ("Plaintiff") respectfully submits the following Opposition to the Motion to Dismiss filed by Thomas Jefferson University Hospitals, Inc. ("Defendant") [Doc. 9].

## I. INTRODUCTION

Defendant's Motion is a skillful attempt to deflect and distract from behavior so illegal and unethical that most health systems would never consider engaging in it. Put succinctly, Defendant participated in a concerted, intentional practice of collecting individually-identifiable health information from visitors to its web properties and sharing this sensitive information with the world's largest social media company to generate revenue by bombarding these people, including its patients, with ads targeted to their specific, individual health concerns.[1] Defendant's actions are illegal and unethical because, among other things:

> long-standing guidance from the U.S. Department of Health and Human Services ("HHS") expressly requires healthcare providers

[1] HIPAA, 43 U.S.C. § 1320(d)(6), defines "individually-identifiable health information" as: "any information, including demographic information collected from an individual, that— (A) is created or received by a health care provider… and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and— (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual."

> not to share individually-identifiable health information collected by their websites, because this information "relates to the individual's past, present, or future health or health care or payment for care;"
>
> people expect hospitals to receive their information to facilitate the provision of informed, effective medical care, treatment, and advice, *not* so they may profit by sending this information to social media platforms without notice or consent to fuel their marketing efforts; and
>
> Defendant's public-facing representations consistently promise to keep patients' personal health information private, confidential, secure, and protected against unauthorized use absent notice and express consent.

Because it cannot offer any *bona fide* legal or ethical justification for its behavior – or refute any of the material facts underlying Plaintiffs' claims – Defendant seeks to evade responsibility by asserting a series of irrelevant and incorrect arguments, including that: the filing of a class action asserting federal claims does not toll the statute of limitations applicable to those claims, Def. Mem., pp. 7-8 [Doc. 9-1], Plaintiff has not pled facts suggesting Defendant acted with a criminal intent or purpose, *id.* at pp. 13-14, Plaintiff has not pled facts suggesting Defendant violated any duty of care owed to Plaintiff or the Class members, *id.* at p. 20, and Plaintiff cannot plead contract and unjust enrichment claims in the alternative. *id.* at p. 27. None of these, or any other, arguments in Defendant's Motion change the fact that Plaintiff's Complaint includes detailed, extensive factual allegations describing plausible ECPA, contract, negligence, privacy, and unjust enrichment claims that – taken together and viewed under the applicable standard – should survive Defendant's Motion.[2]

[2] Many recent decisions from district courts nationwide support this conclusion, including: *W.W. v. Orlando Health, Inc*., 2025 WL 722892 (M.D. Fla. Mar. 6, 2025) (ECPA claim); *Lugo v. Inova Health Care Servs*., 2025 WL 905191 (E.D. Va. Mar. 25, 2025) (ECPA claim); *Doe v. Tenet Healthcare Corp*., 789 F. Supp. 3d 814 (E.D. Cal. June 9, 2025) (ECPA and privacy claims); *Pattison v. Teladoc Health, Inc*., 2025 WL 1756364 (S.D.N.Y. June 25, 2025) (ECPA claim); *I.T. v. ChoicePoint LLC*, 2025 WL 2495079 (W.D. Wash. Aug. 29, 2025), (ECPA claim); *Doe v.*

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Smart v. Main Line Health*, 2024 WL 2943760, *1 (E.D. Pa. June 10, 2024), *citing Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). "Plausibility means 'more than a sheer possibility that a defendant has acted unlawfully.'" *Id.*, *citing Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id., citing Twombly*, 550 U.S. at 556. "In considering a motion to dismiss under Rule 12(b)(6), all well-pleaded allegations in the complaint are accepted as true and interpreted in the light most favorable to the plaintiff, and all inferences are drawn in the plaintiff's favor." *Id., citing McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009).

## III. ARGUMENT

### A. Plaintiff's claims are not time-barred

Defendant opens its argument by admitting that, at this stage of the litigation, before any discovery has occurred, "it is entirely unclear whether [Plaintiff's] individual claims are [] barred by the statute of limitations." Def. Mem. at p. 7 [Doc. 9-1]. Despite this admission, Defendant nevertheless proceeds to argue that Plaintiff's ECPA, privacy, breach of contract, and unjust enrichment claims were not tolled by an earlier-filed federal class action and are time-barred "to the extent they are based on any alleged activity on Defendant's website before" the operative

---

*Deaconess Ill. Union Cnty. Hosp., Inc*., 2025 WL 2771415 (S.D. Ill. Sept. 29, 2025) (ECPA and negligence claims); *Juenger v. Deaconess Health Sys*., 2025 WL 2780221 (S.D. Ill. Sept. 20, 2025), (ECPA and negligence claims); *Vriezen v. Infinite Health Collaborative, P.A.,* 2025 WL 2992204 (D. Minn. Sept. 30, 2025*)* (ECPA and privacy claims); *Hartley v. Univ. of Chicago Med. Ctr*., 2025 WL 2802317 (N.D. Ill. Oct. 1, 2025) (ECPA claim).

limitations start date. *Id.* at pp. 7-8. This argument should not result in the dismissal or limitation of any of Plaintiffs' claims for at least two reasons.

First, determining whether a claim is timely is inherently a fact-based determination. *See Woods v. Ralston*, 2024 WL 2817552, *3 (M.D. Pa. June 3, 2024); *Pearce v. Borough of Glassport*, 2016 WL 3855033, at *4 (n.6) (W.D. Pa. July 15, 2016) (assessing limitations issues involves fact-based inquiries), *citing Miller v. Phila. Geriatric Ctr*., 463 F.3d 266, 276 (3d Cir. 2006) (when the limitations period begins to run "is a factual determination"); *Swope v. Cent. York Sch. Dist*., 796 F. Supp. 2d 592, 605 (M.D. Pa. 2011) (denying motion to dismiss based on a hypothetical lack of timeliness because "any inquiry into the application of the statute of limitations requires a highly factual determination"). Defendant has not provided any factual analysis relating to the timing or accrual of Plaintiffs' claims because no discovery has taken place on these issues. As a result, this Court has no factual or legal basis to endorse Defendant's premature, unsupported, and vague attempt to dismiss all of Plaintiff's claims based on a guess as to when the facts giving rise to those claims may have occurred.

Second, it is well-established that "the filing of a class action asserting federal claims tolls the running of the statute of limitations applicable to those claims while the class action is pending." *Lutz v. Pittsburgh Regional Transit*, 2026 WL 472058, *2 (W.D. Pa. Feb. 19, 2026), *citing American Pipe & Const. Co. v Utah*, 414 U.S. 538, 560– 61 (1974); *Jenkins v. PetSmart, LLC*, 2023 WL 8548677, *15 (E.D. Pa. Dec. 11, 2023) ("the timely filing of a class action tolls the applicable statute of limitations for all persons encompassed by the class complaint"). As a result, the complaint filed in *Murphy v. Thomas Jefferson University Hospitals, Inc.,* E.D. Pa. Case No. 22-cv-4674 [Doc. 1], a materially-identical case pleading a materially-identical ECPA violation for the same class of website visitors, tolled the limitations period running on this claim

from November 22, 2022 until Judge Rufe dismissed the plaintiffs' ECPA claim in *Murphy* as a result of the named plaintiffs' lack of standing on December 17, 2025. Because Plaintiff filed the ECPA claim in this case the very next day, December 18, 2025, the ECPA two-year statute of limitations has run for only one day since November 22, 2022, so currently extends back to November 23, 2020 (two years before the complaint in *Murphy*), not December 18, 2023 (two years before Plaintiff filed this case) as Defendant claims. *See Voicenet Communications, Inc. v. Corbett*, 2006 WL 2506318, *7 (E.D. Pa. Aug. 30, 2006) (ECPA statute of limitations is two years), *citing* 18 U.S.C. § 2707(f).

As a result, this Court should soundly reject Defendant's argument that Plaintiff's ECPA, privacy, breach of contract, and unjust enrichment claims (or parts of these claims) are not timely as premature, lacking any factual basis, and legally unsound.

**B. Plaintiff Pleads A Plausible ECPA Claim**

To state an ECPA claim, a plaintiff must allege that the defendant: "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication, (5) using a device." *In re Google Cookie Placement Litig*., 806 F.3d 125, 135 (3d Cir. 2015), *citing* 18 U.S.C. § 2511(1)(a). Defendant challenges the second and third elements of Plaintiff's ECPA claim (*i.e.,* that it intercepted the contents of covered communications). As discussed below, these arguments are undercut by Plaintiff's allegations that Defendant intentionally installed Meta Collection Tools on its web properties to intercept and disclose to Meta the contents of electronic communications containing statutorily-protected, individually-identifiable health information. *See generally* Complaint [Doc. 1].

#### 1. Plaintiff pleads facts plausibly suggesting Defendant engaged in unlawful interception

Defendant argues it did not "intercept" Plaintiff's communications, because "[t]he ECPA is a one-party consent statute," suggesting "a party to a communication cannot unlawfully 'intercept' a communication directed to it." Def. Mem. at p.9 [Doc. 9-1]. This argument ignores the true nature of Plaintiff's "interception" theory: although Defendant participated in the communications on its web properties, its participation meets the ECPA's "criminal or tortious" exception and supports an ECPA claim because, by sharing with Meta the individually-identifiable health information Plaintiff and the Class members communicated for commercial purposes, Defendant knowingly violated HIPAA.[3] *See* 18 U.S.C § 2511(2)(d); 42 U.S.C. § 1320(d)(6); Complaint at ¶¶ 111-129, 199, 204, [Doc. 1].

More specifically, the ECPA provides that an electronic communication may be intercepted where "one of the parties to the communication *has given prior consent* to such interception *unless* such communication is intercepted for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2510(8) (emphasis added). Regardless of whether Defendant was a party to Plaintiff's and the Class members' communications, or consented to their interception, Defendant is liable under the ECPA's "criminal or tortious" exception, because it intercepted these communications knowing that it would violate HIPAA to share this information with a third party for commercial purposes without informed consent. Complaint ¶¶ 187-204 [Doc. 1]. *See Peruto v. Roc Nation*, 385 F. Supp. 3d 384, 391 (E.D. Pa. 2019) ("unilateral consent is sufficient *in the*

[3] For example, courts have interpreted the "criminal or tortious" provision in 18 U.S.C § 2511(2)(d) to prohibit wiretaps which were conducted with a criminal or tortious purpose beyond the intent to commit a wiretap violation itself. *Cf.* Def. Mem. at p. 12 [Doc. 9-1].

*absence of tortious intent*") (emphasis added).[4]

HIPAA makes it a federal crime to "knowingly" disclose "individually identifiable health information" to third parties. *See* 42 U.S.C. § 1320d(6).[5] Defendant does not deny having disclosed information collected from its web properties to Meta, or even that this conduct is illegal. *Cf.* Complaint at ¶¶ 4, 23-25, 30-31, 72-73, 154 [Doc. 1] *with* Def. Mem. at pp. 8-17 [Doc. 9-1]. Instead, Defendant seeks to dismiss Plaintiff's ECPA claim by arguing its interception and disclosure of Plaintiff's communications happened at the same time (*e.g.,* not "separately" from the disclosure) and the disclosed information was not used to commit an independent crime. *See* Def. Mem. at pp.10-11, *quoting In re Google Cookie Placement*, 806 F.3d at 145 *and Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010).[6] These arguments are based on a mistaken premise that the "interception" and "disclosure" Plaintiff alleges are the same event.

The ECPA defines "*interception*" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other

[4] Under *Peruto,* Defendant's consent to the interception of Plaintiff's and the Class members' individually-identifiable health information is invalidated by its tortious intent in sharing those communications with Meta without notice or consent. Nor did Plaintiff provide consent for Defendant to share her protected health information with Meta by virtue of accepting Facebook's Terms of Use and Pixel data sharing policies. *See In re Meta Pixel Healthcare Lit*., 647 F.Supp.3d at 793-794 (holding Facebook's Terms of Use and Pixel data sharing policies do not provide a valid basis for consent, because the average person would not assume or understand a social media company has access to their protected health information) (citations omitted).

[5] Notably, "covered entities . . . may be prosecuted directly under 42 U.S.C. § 1320d-6" and "the 'knowingly' element of the offense set forth in that provision requires only proof of knowledge of the facts that constitute the offense." *www.justice.gov/sites/default/files/olc/opinions/attachments /2014/11/17/-hipaa_final.htm.*

[6] Defendant conspicuously fails to mention that the plaintiffs' ECPA claims in these cases were dismissed because, unlike Plaintiffs here, they did not plead an independent tortious use separate from the defendant's act of interception. *See In re Google Cookie Placement*, 806 F.3d at 145 ("'intrusion upon seclusion presents a problem… - it is a tort that occurs through the act of interception itself'"), *quoting Caro,* 618 F.3d at 101.

device." 18 U.S.C. § 2510(4). Plaintiff specifically pleads facts describing how Defendant intercepted (*i.e.,* acquired) the contents of multiple types of communications on its web properties. *See* Complaint at ¶¶ 18-33, 54-64, 71-76, 156-161, 164-170, 189-191 (Meta Collection Tools capture extensive information from visitors of Defendant's web properties including their IP addresses, Facebook IDs, cookie identifiers, device identifiers, account numbers, the names, addresses, phone numbers and e-mail addresses they enter on the site, and all the information they access, communicate, request, and view through interactions with buttons, links, pages, and tabs) [Doc. 1]. Separately, HIPAA defines "*disclosure*" as "the release, transfer, provision of access to, or divulging in any manner of information outside the entity holding the information." 45 C.F.R. § 160.103. Plaintiff specifically pleads facts describing how Defendant disclosed (*i.e.,* released) all the information it acquired from communications with Plaintiff and the Class members to Meta. Complaint at ¶¶ 3, 31, 54, 56-64, 72-76, 157-159, 161, 164-166, 168, 189-190 (Meta Collection Tools transmit information intercepted from communications on Defendant's web properties to Meta) [Doc. 1]. Thus, Defendant's act of *intercepting* individually-identifiable health information from Plaintiff and the Class members is independent of its unlawful *disclosure* of that information to Meta, meaning that its conduct falls squarely within the ECPA's "criminal or tortious" exception.

Defendant also argues that Plaintiff has not adequately pled it acted with a criminal, as opposed to a legitimate commercial, intent or purpose. Def's. Mem. at pp. 13-14 ("the alleged intent of Jefferson Health's conduct was to advance its advertising services to users of its website, which is not sufficient under the crime-tort exception") [Doc. 9-1]. There are three obvious flaws in this argument.

First, on a motion to dismiss, Defendant's intent to violate HIPAA can be inferred from the fact that the disclosures in its Privacy Policies (*i.e.,* that "[w]e or our vendors may use… pixels" to collect things like "device identifiers, your IP address… and the length and time of the visit" for "marketing purposes") clearly stop short of fully describing its actual conduct, which included disclosing patients' individually-identifiable health information for commercial purposes. Complaint at ¶¶1-14, 54-55, 65-83 [Doc. 1].[7]

Second, Defendant's argument overlooks the obvious: that Defendant committed a federal crime by knowingly sharing the class members' individually-identifiable health information with Meta. Complaint at ¶¶ 4-5, 54, 123-139, 190, 199-204 [Doc. 1]. The fact that Defendant's crime might have provided both it and Meta with a commercial benefit cannot possibly preclude a finding of criminal motivation. If that were true, it would be impossible to prove criminal intent for any successful theft. *Stein v. Edward-Elmhurst Health,* 2025 WL 580556, *1 (N.D. Ill. Feb. 21, 2025) ("Courts from coast to coast have recognized that a violation of HIPAA can give rise to the crime-tort exception under the ECPA") (compiling cases); *Kane v. Univ. of Rochester,* 2024 WL 1178340, *7 (W.D.N.Y. Mar. 19, 2024) (denying motion to dismiss ECPA claim where "Plaintiffs have plausibly alleged that Defendant's purpose was to commit an act that is punishable as a crime under 42 U.S.C § 1320d-6: knowingly disclosing IIHI without authorization for marketing purposes"); *A.D. v. Aspen Dental Mgmt., Inc*., 2024 WL 4119153, *3 (N.D. Ill. Sept. 9, 2024) (ECPA crime-tort exception applies because defendant's financial motivation "cannot be detached

[7] Defendant claims to use tracking technologies to provide "a more user-friendly experience on its websites and inform[] individuals through advertisements about medical information that may be of benefit to them," Def. Mem at p.13 [Doc. 9-1], although HHS advised all HIPAA-covered entities in December 2022 that they were "not permitted to use tracking technologies in a manner that would result in impermissible disclosures" because "this tracking information could also be misused to promote misinformation, identify theft, stalking, and harassment." Complaint at ¶¶ 124-129 [Doc. 1]. *See* HHS.gov, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022).

from the reality that [its claimed goal of achieving a] marketing and revenue boost [was accomplished] by disclosing Plaintiffs IIHI"); *Murphy,* 2024 WL 4350328 at *4 ("If Plaintiffs' allegations are to be taken as true, which the Court must do at the motion to dismiss stage, Defendant at minimum intended to violate HIPAA with the disclosure of Plaintiffs' IIHI to Meta").[8]

Third, some of the cases Defendant cites suggest "commercial purposes or advantages are not the stuff of which a crime-tort is made," Def Mem. at pp. 14-15 [Doc. 9-1] – but these cases do not involve the sharing of statutorily-protected, individually-identifiable health information. *See Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125, 1136 n.8 (9th Cir. 2022) (claims based on secret recording of conversations for "gotcha undercover videos"); *Katz-Lacabe v. Oracle America, Inc.* 2024 WL 1471299, *3 (N.D. Cal. Apr. 3, 2024) (claims based on tracking of generic web browsing activity). *Cf. Ramirez v. LasikMD USA, Inc.*, 2026 WL 194855, *3 (S.D. Cal. Jan. 26, 2026) ("even where a defendant is arguably motivated by monetary gain, the tort or crime exception may apply").

For all these reasons, Plaintiff's allegations that Defendant engaged in criminal conduct by knowingly disclosing Plaintiff's and the Class members' individually-identifiable health information to Meta without their notice or consent adequately allege an illegal interception of communications in violation of the ECPA. Complaint at ¶¶ 189-204 [Doc. 1]. *See* 18 U.S.C. § 2510(4) and (8); 18 U.S.C. § 2511(1)(a); 42 U.S.C. § 1320(d)(6); 45 C.F.R. § 160.103; *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1107 (9th Cir. 2014); *In re Pharmatrak, Inc. Privacy Litig.,* 329 F.3d

[8] While some courts have found the crime-tort exception does not apply when the underlying motivation is financial, as opposed to criminal or tortious, this approach is "difficult to square with the statutory text [as] [t]he language of the statute gives no hint that conduct falls outside the reach of the statute if a person acted based on financial motivations." *Stein*, 2025 WL 580556 at *5.

9, 18 (1st Cir. 2003); *In re Meta Pixel Healthcare Lit*., 647 F.Supp.3d 778, 800-801 (N.D. Cal., 2022).[9]

**2. Plaintiff pleads facts plausibly suggesting Defendant intercepted the "contents" of its patients' communications**

In seeking to dismiss Plaintiff's ECPA claim, Defendant argues that the contents it intercepted and disclosed to Meta do not convey the "substance, purport, or meaning" of communications on Defendant's web properties. Def. Mem. at p. 17 [Doc. 9-1]. The basis for this argument is Defendant's unsupported conclusion that the Meta Collection Tools installed on its web properties did not send the content of any patient communications to Meta.[10] *Id.* (information

[9] Allowing Plaintiffs to proceed with their ECPA claim will not, as Defendant suggests, "undermine HIPAA's enforcement scheme" for two reasons. First, the case Defendant cites for support dismissed the plaintiff's ECPA claim because the defendant's "purpose of using online tracking technologies" "was not to commit a crime or tort (or breach HIPAA)" but to "enhance the online experience for users." *Roberts v. Charlotte Mecklenburg Hosp. Auth*., 2025 WL 880538, *3 (W.D.N.C. Mar. 20, 2025). This is clearly an incorrect analysis of the ECPA "criminal or tortious" exception. The *Roberts* court should, instead, have asked whether the defendant's purpose in sharing IIHI with third parties for commercial purposes without notice or consent was to commit a crime or tort or breach HIPAA, which would likely have produced a different result. Second, the clear purpose of HIPAA is to ensure medical records are adequately protected and kept private. Here, despite its obligations under HIPAA, Defendant collected HIPAA-protected communications from Plaintiff and the Class members and shared them for commercial and marketing purposes with third parties without notice or consent. Allowing Plaintiff to proceed with her ECPA claim will actually serve, not undermine, the purpose of HIPAA by reminding Defendant of its duties under HIPAA and encouraging its compliance with those duties, a result obviously not achieved by the possibility of DHS action under HIPAA's enforcement scheme. The mere existence of an alternative enforcement mechanism does not preclude other available avenues for the enforcement of legal rights. *See, e.g., Weston v. Perez*, 2017 WL 4541732, *3-4 (S.D. Cal. Oct. 11, 2017) (denying motion to dismiss 42 U.S.C. § 1983 claim based on unauthorized medical record access because the plaintiff had a legitimate expectation of privacy in her confidential medical records under HIPAA – *not* dismissing the claim because the right to enforce HIPAA's protections lies only with DHS).

[10] The ECPA broadly defines "contents" to include "any information concerning the substance, purport, or meaning of [an electronic] communication." 18 U.S.C. § 2510(8). Plaintiff has alleged that, by viewing and selecting specific pages, tabs, buttons, and links on Defendant's web properties, people engage in substantive communications with Defendant through its web properties, requesting and receiving information about specific healthcare-related topics relevant to them. Complaint at ¶¶7, 31, 54, 71-76, 158, 165, 189-191. [Doc. 1]. Plaintiff has also pled that

transmitted to Meta "does not reflect the substantive content of any electronic communication by Plaintiff and shows mere record information"). This conclusion ignores the nature of the information Plaintiff and the Class members communicated to Defendant in their interactions with its web properties and represents a stark, unjustified departure from Plaintiff's allegations.

Plaintiff alleges that the Meta Collection Tools on Defendant's web properties are designed to capture extensive information about everyone who uses these websites, including their IP address, Facebook ID, cookie identifiers, device identifiers, and account numbers. Complaint at ¶¶ 7, 18-19, 34-39, 71, 158, 165 [Doc. 1]. This information enables Defendant and Meta to learn and record the identity of everyone who interacts with its web properties. *Id.* at ¶¶ 7, 34-39, 158-159, 165-166. Plaintiff has also alleged that, by viewing and selecting specific pages, tabs, buttons, and links on Defendant's web properties, visitors engage in substantive communications with Defendant, requesting and receiving information about specific healthcare-related topics of interest to them. *Id.* at ¶¶7, 31, 54, 71-73 (explaining how website users communicate their interest in healthcare-related topics to Defendant and receive the requested information from Defendant).[11] Plaintiff has further alleged that Defendant's Meta Collection Tools capture all the information (*i.e.,* name, date of birth, address, contact e-mail, phone number, and medical area of interest) that

the Meta Collection Tools Defendant installed on its web properties have captured both the "contents" of these communications (*i.e.*, the individually-identifiable health information communicated by the buttons, links, pages, and tabs website visitors click and view) and their "characteristics" (*i.e.,* IP addresses, Facebook ID, cookie identifiers, device identifiers and account numbers), *id.* at ¶¶7, 71-76, 189-191, both of which satisfy the ECPA definition of "contents."

[11] As Plaintiff alleges, HHS has long warned healthcare providers against installing tracking technologies on their websites, the very thing Defendant chose to do here, precisely because "[t]racking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions… or that permits individuals to search for doctors or schedule appointments," may have access to protected health information when such tracking technologies collect information that identifies the individual." Complaint at ¶12, 135-139 [Doc. 1].

Plaintiff and the Class members enter on Defendant's web properties to request an appointment providing further identifying information. *Id.* at ¶¶ 155, 163.[12]

These allegations are all consistent with the HHS Bulletin representing the federal government's best and most current guidance on the perils of tracking technology used in the healthcare context.[13] The HHS Bulletin expressly warns that tracking technologies can access – and routinely do access – protected health information:

> IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services… [for example,] if an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, ***the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care.***

*Id.* (emphasis added).

---

[12] To minimize its abuse of Plaintiff's privacy rights, Defendant falsely characterizes her interactions with its web properties as merely "navigating through a website." Def. Mem. at pp. 1, 18, 24 [Doc. 9-1]. By contrast, Plaintiff has pled her interactions with Defendant's web properties were "communications" with Defendant because her use of its website involved interacting with buttons, links, pages, and tabs to request specific information and, in response, being directed to pages on which Defendant provided the requested information. Complaint at ¶¶ 5, 9, 31-33, 54, 71-74, 156-158, 164-165, 190-191 [Doc. 1]. *See James v. Walt Disney Co.*, 2023 WL 7392285 at *11 (N.D. Cal. Nov. 8, 2023) (plaintiffs met the specificity requirement for ECPA claim by alleging defendant intercepted information about the webpages they viewed); *In re Pharmatrak*, 329 F.3d at 13 (allowing ECPA claim where defendant implemented technology to record webpages viewed, time users spent on each page, and path through the site).

[13] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 8, 2026) (emphasis added).

Similarly, the recent HIPAA guidance cited in Plaintiff's Complaint expressly recognizes that the tracking technologies installed on Defendant's web properties collect the contents of communications, including individually-identifiable health information. Complaint at ¶120-123 [Doc. 1], *citing https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html* ("HHS Guidance").[14] The HHS Bulletin did not create any *new* obligations or duties. Instead, the government issued this Bulletin to *remind* covered entities like Defendant of their long-standing obligation to protect communications seeking healthcare information from a HIPAA-covered entity's website. *Id.* ("it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors"). These HHS regulations provide further support that Defendant has not intercepted and disclosed simple "record information," but rather the contents of patient communications that convey the substance of their requests for substantive healthcare information from a HIPAA-covered entity's website. This precedent all demonstrates that Plaintiff has plausibly pled a violation relating to statutorily-protected "contents" communicated on Defendant's website.

Many courts have agreed these types of disclosures are "contents" under the ECPA. *See e.g., Stein,* 2025 WL 580556 at *1 (supporting the adequacy and viability of ECPA claim based on virtually-identical facts); *R.S. v. Prime Healthcare Services, Inc.,* 2025 WL 103488, *2-7 (C.D. Cal. Jan. 13, 2025) (same); *Murphy,* 2024 WL 4350328 at *4 ("By alleging that Defendant was able to collect and transmit [IIHI] using the Meta Collection Tools on [its] online portal… Plaintiffs have sufficiently pleaded that [it] intercepted contents of Plaintiffs' communications

---

[14] Explaining that "individually-identifiable health information" is included within HIPAA's definition of "protected health information," 45 CFR § 160.103, and that tracking technologies on hospital webpages that address specific symptoms or health conditions or permit individuals to search for doctors or schedule appointments can provide access to protected health information like an individual's e-mail or IP address.

under the meaning of the ECPA"); *Kurowski v. Rush Sys. for Health,* 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023) (denying motion to dismiss ECPA claim based on "factual allegations [that] information… was transmitted to third parties with Rush's knowledge… [and] used [] to target [plaintiff] with particular advertising associated with her particular health conditions… knowingly [and]… for the purpose of financial gain"); *Doe v. Meta,* 2023 WL 5837443, *1 (N.D. Cal. Sept. 7, 2023) (website communications satisfy ECPA definition of "content," because they convey the substance of requests for information about specific conditions, treatments, providers, and locations); *Cousin v. Sharp Healthcare,* 702 F. Supp. 3d 967, 976 (S.D. Cal. 2023) (denying motion to dismiss CMIA and CIPA claims, like Plaintiff's ECPA claim, because "Plaintiffs allege that their data included personal search queries—such as specialty healthcare providers and treatments for medical conditions—and therefore plausibly conveyed content: their PHI"). Notably, in the consolidated lawsuit challenging the use of Meta Pixels on hospital websites nationwide, the court specifically *rejected* Meta's argument that a website address (*i.e.,* "URL") that identifies the web pages an individual has viewed, "function[s] like an address, not contents of a communication" and held that the same types of disclosure Plaintiff alleges here qualify as "contents." *Cf.* Complaint at ¶¶7, 31, 54, 71-76, 158, 165, 189-191 [Doc. 1] *with In re Meta Pixel Healthcare Lit*., 647 F.Supp.3d at 795.[15]

[15] As *In re Meta Pixel Healthcare Lit*., 647 F.Supp.3d at 795, even Defendant's cited authorities support Plaintiffs' side of this argument: "[T]he kinds of descriptive URLs identified in the Smith Decl. are "contents" within the meaning of the statute. Unlike in *Zynga*, the URLs at issue here would not merely reveal the name of a Facebook user or group—as Smith explained, the transmitted URLs include both the "path" and the "query string" [citations omitted]. These items are content because they concern the substance of a communication. *See* Def. Mem. at p.17 [Doc. 9-1], *citing Zynga*, 750 F.3d at 1107; *In re Google Cookie Placement*, 806 F.3d at 137 ("If an address, phone number, or URL is... part of the substantive information conveyed to the recipient, then by definition it is 'content'"); *see also In re Google RTB Consumer Priv. Litig*., 2022 WL 2165489, *10 (N.D. Cal. June 13, 2022) (finding that categories of the website, categories that describe the current section of the website, and referrer URL that caused navigation to the current page constituted "content").

All these facts, taken together and accepted as true, state a plausible claim that Defendant engages in communications with visitors to its web properties and uses Meta Collection Tools to capture substantive information from these communications and deliver it to Meta. At this litigation stage, it would be improper for the Court to make contrary findings of fact to resolve these contested issues. *See T.D.H. v. Kazi Foods of New Jersey, Inc*., 2023 WL 4567722, *4 (E.D. Pa. July 17, 2023) (drawing inferences to resolve contested facts is improper at the motion to dismiss stage); *Stirone v. McHutchison Inc*., 2018 WL 1256777, *4 (W.D. Pa. Mar. 12, 2018) (defendant's argument relies on contested facts not in evidence, so is premature); *Wormack v. Shinseki*, 2010 WL 2650430, *1 (W.D. Pa. July 1, 2010) ("a court, when evaluating a motion to dismiss, accepts as true all of a plaintiff's factual allegations"), *citing Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

### D. Plaintiff Pleads A Plausible Breach Of Contract Claim

To plead a breach of contract under Pennsylvania law, a plaintiff must allege facts regarding the existence of a contract, including its essential terms, a breach of a duty imposed by the contract, and resulting damages. *Doe v. Haverford Coll*., 2023 WL 5017964, *5 (E.D. Pa. Aug. 7, 2023). Citing two Pennsylvania state-court cases from 1993 and a 2008 New Jersey state-court case, Defendant argues that Plaintiff has inadequately pled the details of the Parties' alleged contract, specifically including a lack of "mutual assent," consideration, and damages. Def. Mem. at pp. 18-20 [Doc. 9-1]. Ignoring Defendant's inability to marshal any controlling precedent for these arguments, even a cursory review of the Complaint reveals that Plaintiff has pled facts supporting a plausible breach of contract claim.

Plaintiff pleads a breach of contract claim based on terms found in two agreements, Defendant's Website Terms and Conditions (*https://www.jeffersonhealth.org/terms-and-*

*conditions*) and Defendant's Privacy Practices (*https://www.jeffersonhealth.org/privacy-practices*). Complaint at ¶¶ 194-197 [Doc. 1]. Plaintiff also pleads that Defendant requires all users to accept these agreements as a condition of interacting with its web properties, and are entitled to an inference that Plaintiff accepted these agreements by interacting with these web properties. *Id.* at ¶194.[16] Plaintiff received consideration in the form of medical information received from Defendant's web properties, while Defendant received consideration in the form of access to disclosed types of "personal information" to improve the performance of its Web Properties. *See* Small Dec. Ex. 1, §§ 2-3 (May 14, 2024 privacy policy) *and* Small Dec. Ex. 2, §§ 2-3 (February 16, 2026 privacy policy) [Doc. 9-2]. Plaintiff further pleads that these agreements contain many express, binding promises from Defendant to all users, including that it will: keep their protected health information private; obtain written permission before selling or using protected health information for marketing activities; not collect any personal information from website visitors; not share any personal information from website visitors with its partners; and not use IP addresses to identify individual visitors. *Id.* at ¶ 198. The Complaint also contains specific allegations explaining how Defendant breached these promises. *Id.* at ¶ 199. Because Plaintiff has pled specific facts supporting her breach of contract claim, and the Court must construe these allegations in the light most favorable to her, *see ABEC, Inc. v. Eat Just, Inc.,* 2023 WL 8845327, *3 (E.D. Pa. Dec. 21, 2023), Defendant's "inadequate pleading" argument falls flat.

Defendant also challenges the sufficiency of Plaintiff's contract damage allegations. Def. Mem. at pp. 6, 19-20 [Doc. 9-1], *citing Adair v. Cigna Corporate Services, LLC*, 2026 WL 295744, *11-13 (E.D. Pa. Feb. 4, 2026). Defendant levels this challenge based on an assumption that

---

[16] These agreements also applied to users of the Defendant's MyChart portal. *See htttps://mychart.jefferson.edu/mychart/Authentication/Login?mode=stdfile&option=termsandconditions* ("Individual is responsible for viewing and abiding by the terms and conditions of use and the privacy statements on the other Web sites").

Plaintiff's contract claim relies on "two [] theories of purported harm" that *Adair* recently held not to provide Article III standing, namely: "a diminution in value of her personal information and overpayment for services." *Id.* There are three clear flaws in this argument.

First, the Complaint actually alleges that Defendant's breaches of contract caused Plaintiff and the Class members six types of damages. Defendant's Motion does not mention (much less analyze) four of these (*i.e.,* nominal damages; damages from Defendant's failure to share benefits derived from sharing and using their protected health information without consent; damages from a loss in value of their property rights; and damages from being deprived of the benefit of the bargain from their medical services agreement), so does not provide a basis to dismiss this claim either for lack of Article III standing or for a failure to plead a required claim element. *Cf.* Complaint at ¶ 201(a), (c), (e)-(f) [Doc. 1] *with* Def. Mem. at p.6, 19-20 [Doc. 9-1].

Second, Defendant completely ignores – and offers nothing to refute the sufficiency of – Plaintiff's claim that contract damages flow from Defendant's failure to maintain the confidentiality of its patients' information, or its successful effort to derive value from using and sharing the contents of patients' communications on its web properties without their knowledge or consent. *Cf.* Complaint at ¶¶ 201(b)-(c) *with* Def. Mem. at p.6, 19-20.

Third, Defendant's argument that its misuse of personal health information does not cause an economic loss is based entirely on reasoning from pre-2012 cases that do not address modern conceptions of the use and value of personal data – as explained in this Court's decision in *Opris v. Sincera Reproductive Medicine*, 2022 WL 1639417, *1 (E.D. Pa. May 24, 2022). In *Opris*, a hacker gained access to a healthcare provider's computer network holding patients' personal identifiable information and protected health information, including driver's license numbers, medical diagnosis and treatment information, prescription information, treating and referring

physician information, and health insurance information and posted some of this information to a third-party ransomware website. *Opris*, 2022 WL 1639417 at *1. The defendant eventually contained this breach and later informed the plaintiffs "their [information] may have been exposed to third parties." *Id.* The plaintiffs filed a negligence claim and (as here), without pleading any specific piece of data was disclosed or putting a specific value on their injuries, (as here) claimed damages relating to the negligent handling of their information. *Id.* at *6.[17] The defendant moved to dismiss, arguing (like Defendant here) that the plaintiffs had not pled an actual injury. *Id.* at *3, 6. After a detailed analysis that includes a discussion of cases recognizing the property value of disclosed personal information, the court held that the plaintiffs had suffered damages relating to the "loss of value to their PII and PHI." *Id.* at *8. The reasoning and holding in *Opris*, which Defendant's contract-based damages argument does not mention or discuss, plainly support a finding that Plaintiff has pled plausible damages flowing from Defendant's breach of the Terms and Conditions and Privacy Practices.[18]

For all these reasons, Plaintiff has pled facts supporting her standing to sue for breach of contract and pled facts sufficient to state a plausible breach of contract claim, meaning the Court should deny Defendant's Motion to dismiss this claim.

---

[17] The *Opris* plaintiffs' damages included: "theft of their PII and/or PHI, the costs of credit monitoring and identity theft detection services, lowered credit scores, costs associated with time spent and the loss of productivity due to certain actions to protect against further harm, such as finding fraudulent charges and cancelling and reissuing cards, loss of value to their PII and PHI, and the increased and continued risk of exposure to hackers and thieves of their PII and PHI."

[18] This conclusion is also consistent with other controlling cases holding that specific allegations of value are not required to satisfy a damage pleading requirement, *see Sheet Metal Workers Loc. 19 v. Keystone Heating & Air Conditioning,* 934 F.2d 35, 40 (3d Cir. 1991); *Barker v. Maurus*, 2022 WL 4542104, *2 (E.D. Pa. Sept. 27, 2022); *Ambrogi Food Distribution, Inc. v. Teamsters Loc. Union No. 929*, 595 F. Supp. 3d 352, 358 (E.D. Pa. 2022), and endorsing claims flowing from the failure to adequately protect sensitive information, *see In re Wawa, Inc. Data Sec. Litig*., 2021 WL 1818494, *5 (E.D. Pa. May 6, 2021) (denying motion to dismiss negligence claim).

### E. Plaintiff Pleads A Plausible Negligence Claim

A plaintiff must plausibly plead four elements to support a negligence claim: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages. *Speicher v. Rocket Mortgage, LLC*, 2023 WL 2890154, *4 (E.D. Pa. Apr. 11, 2023). Defendant claims Plaintiff's Complaint does not satisfy any of these elements. Def. Mem. at pp. 20-23 [Doc. 9-1]. These arguments are undermined by allegations in the Complaint that Defendant, without providing notice to its patients or receiving their informed consent, disclosed the contents of electronic communications containing statutorily-protected, individually-identifiable health information to Meta, causing Plaintiff discernable economic harm.

#### 1. Plaintiff pleads facts that plausibly support the imposition of a duty of care

Defendant argues it has not violated any duty of care owed to Plaintiff or the Class members because "Plaintiff's negligence claim is predicated upon… Pennsylvania's Health Information Privacy Act… and [HIPAA]… Neither of [which] permit a private cause of action [so do not] establish a duty of care owed by Jefferson Health to Plaintiff." Def. Mem. at p. 20 [Doc. 9-1]. Defendant's framing of this argument is intentionally misleading – and ultimately meritless – because it fully ignores, without any explanation, the many facts Plaintiff pled to justify imposing a duty of care on Defendant beyond its obligations under federal or state law.[19] Because Defendant

[19] These facts include: its creation and maintenance of web properties as a public healthcare resource; its employment relationship with its doctors; its issuance of Patient Rights & Responsibilities giving patients "the right to… [e]xpect all communications and records related to care… to be treated as private;" its issuance of a Notice of Privacy Practices that acknowledges "information about you and your health is very personal;" its issuance of a Notice of Privacy Practices that claims "we strive to protect your privacy [and] are required by law to maintain the privacy of our patients' protected health information;" its issuance of a Notice of Privacy Practices that represent "we will obtain your written permission when the uses and disclosures of PHI are for marketing purposes;" its issuance of a Notice of Privacy Practices that represent "Should we

is flatly wrong to suggest Plaintiff only seeks to impose a duty on Defendant under Pennsylvania's Health Information Privacy Act and HIPAA, its argument that Plaintiff's negligence claim should fail on this ground is fatally flawed. *See, e.g., Aspen Dental*, 2024 WL 4119153, *9 (complaint alleged plausible duty to prevent disclosure of private health information where defendant was alleged to have disseminated personal information without consent); *Murphy,* 2024 WL 4350328 at *11-12 (finding plaintiffs' allegations plausibly alleged "the existence of a duty of care").

**2. Plaintiff pleads facts plausibly suggesting Defendant breached its duty of care**

Defendant continues its limited reading of the Complaint, suggesting Plaintiff has not pled a breach of any duty imposed by Pennsylvania's Health Information Privacy Act or HIPAA (*i.e.,* by disclosing the results of their diagnostic procedures), so her negligence claim should fail. Def. Mem. at p. 21 [Doc. 9-1]. This argument is most obviously flawed because it ignores the factual allegations Plaintiff pled explaining that Defendant breached the duties owed to Plaintiff (other than those imposed by statute) by:

> placing computer code on its web properties that intercepts the characteristics and content of communications about individually-identifiable patient health information and automatically transmits this data to Meta, putting this data to its own commercial use, and allowing Meta to put this data to its own commercial use, without providing adequate notice to users of its web properties, or receiving their informed consent

Complaint at ¶¶ 212 [Doc. 1].

---

wish to disclose your PHI in any manner that would constitute a sale of your PHI, we will obtain your written authorization to do so;" by issuing an Online Privacy Statement representing that: "you may visit our website without submitting any information about yourself… we do not share this information with any other partners, affiliates or members of JHS… IP addresses are not used to identify individuals." *Compare* Complaint at ¶¶ 221-226 [Doc. 1] *with* Def. Mem. at p. 21 ("Plaintiff… does not plead any other basis for a duty of care").

Plaintiff's Complaint pleads facts supporting the plausibility of a breach by specifically describing the individually-identifiable health information that Defendant's website collected from visitors and Defendant shared with Meta. *See e.g., id.* at ¶¶ 65-83, 145-153, 214. This information includes all the contact information Plaintiff and the Class members submitted to request appointments with Defendant's providers (*e.g.,* names, addresses, phone numbers and e-mail addresses), all the information Meta Pixels culled from Plaintiff's and the Class members' computers (*e.g.,* IP addresses, Facebook IDs, cookie identifiers, device identifiers, and account numbers), and all the information the Meta Pixels collected from Plaintiff's and the Class members' substantive communications with Defendant on its website concerning the specific healthcare-related topics of interest to them. *Id.* Defendant breached the duty of care it owed to Plaintiff and the Class members by sharing this information with Meta.

**3. Plaintiff pleads facts plausibly supporting a conclusion that she suffered damages proximately caused by Defendant's conduct**

In conclusory fashion, presuming the Court agrees that Plaintiff's duty and breach allegations are deficient, Defendant suggests Plaintiff has not pled the causal link and damages required to support a negligence claim. Def. Mem. at pp. 21-23 ("Plaintiff provides no details regarding the alleged disclosures in this case," so her allegations are "insufficient to plausibly allege causation [or] damages") [Doc. 9-1]. This conclusion suffers from three fatal flaws.

First, Plaintiff claims to have used Defendant's web properties to seek information from, and communicate with, Defendant about her medical conditions concerns, symptoms, appointments, providers, treatments, medications, bills, and insurance. *See generally* Complaint [Doc. 1].[20] These allegations plausibly suggest Plaintiff's damages would not have occurred "but

[20] For example, Plaintiff alleges that the Meta Collection Tools Defendant installed on its web properties captured: all the information she accessed, communicated, requested, and viewed through interactions with buttons, links, pages, and tabs on Defendant's web properties; all the

for" Defendant's conduct and that Defendant's transmission of Plaintiff's individually-identifiable health information from its web properties to Meta was a "substantial cause" of Plaintiff's harm, satisfying the causation pleading requirement. *See Djebe Diallo v. GEICO Advantage Ins. Co.*, 2023 WL 3689700, *4 (E.D. Pa. May 26, 2023) ("but for causation is a *de minimis* standard... under which even the most remote and insignificant force may be considered the cause of an occurrence); *Torres v. United States*, 2023 WL 2368728, *22 (E.D. Pa. Mar. 6, 2023); *State Farm Fire & Cas. Co. v. Cohen*, 2020 WL 5369626, *7 (E.D. Pa. Sept. 8, 2020).

Second, Defendant's "no causation" argument also ignores Plaintiff's substantial allegations about why Defendant and Meta engaged in this scheme: because the Meta Pixels collected individually-identifiable health information that enabled Meta to build out its individual user profiles and sell valuable advertisements targeted to Plaintiff's and the Class members' specific medical concerns and conditions and enabled Defendant to target the ads people see on its website to their specific interests. *Id*. at ¶¶ 12, 27-28, 83-84 [Doc. 1]. Plaintiff's negligence claim is plausible, because her Complaint presents extensive allegations explaining how Defendant's breaches of duty to protect Plaintiff's individually-identifiable health information enabled Defendant and Meta to put this data to multiple commercial uses without notice or consent, thereby causing Plaintiff's injuries.

---

"characteristics" of these communications, including her individual IP addresses, Facebook IDs, cookie identifiers, device identifiers, and account numbers; and all the identifying information (names, addresses, phone numbers and e-mail addresses) she entered to request appointments on Defendant's web properties. *Id.* at ¶¶ 5-9, 54, 56-64, 71-76, 157-159, 164-166, 189-191. Plaintiff further alleges that Defendant negotiated an agreement under which it would disclose these captured communications to Meta to build-out its individual user profiles, sell valuable advertisements targeted to Plaintiff's and the Class members' specific medical concerns, and allow Defendant to tailor the ads Plaintiff and the Class members see on its web properties to their specific medical concerns – all of which caused their claimed damages. *Id.* at ¶¶ ¶3-9, 18-33, 20-27, 50-54, 56-64, 72-77, 160-162, 167-170.

Third, negligence claims in this Court do not have to plead damages with specificity to be viable. *Barker*, 2022 WL 4542104, at *2; *Sheet Metal Workers Loc. 19,* 934 F.2d at 40 (Rule 8 "does not require that the demand for judgment be pled with great specificity"). Instead, under the liberal notice pleading regime in Rule 8, a plaintiff need only "provide enough specificity to give defendants notice of their possible damages." Fed. R. Civ. P. 8. *See Ambrogi Food Distribution*, 595 F. Supp. 3d at 358 (citing cases). Plaintiff has cleared this hurdle by putting Defendant on notice of six types of damages flowing from its conduct, including: a loss of the full value of healthcare services for which she paid, which included a duty to maintain the confidentiality of her individually-identifiable health information; being deprived of value Defendant should have paid for putting her individually-identifiable health information to various commercial uses; and diminishing the value of her property rights in her individually-identifiable health information. Complaint at ¶ 213(a)-(f) [Doc. 1].

Ignoring this low bar, Defendant cites three non-binding federal cases in which damage allegations were found wanting for different reasons, none of which is particularly relevant to this case. *See* Def. Mem. at p.22 [Doc. 9-1], *citing T.D. v. Piedmont Healthcare, Inc*., 2024 WL 3972984, *3 (N.D. Ga. Aug. 28, 2024) (plaintiffs failed to allege any facts suggesting any of them actually suffered any damages); *Smidga v. Spirit Airlines, Inc*., 2024 WL 1485853, *2 (W.D. Pa. Apr. 5, 2024) (the software operating on the defendant's website did not collect personal identifying information from website visitors, so had no impact on the value of the plaintiffs' personal information); *Kennedy v. Petrus*, 2019 WL 1871017, *5 (M.D. Pa. Apr. 4, 2019) (the plaintiff did not allege any specific conduct by the defendants causing an identifiable injury). These cases do not analyze or consider – so do not obviate – this Court's 2022 *Opris* decision, analyzing the damages caused by the mis-handling of personal health information as Plaintiff has

alleged and strongly suggesting Plaintiff's damage and causation allegations are plausible. *See* Section III(C), above (discussing sufficiency of damage allegations based on an unauthorized sharing of protected health information); *Murphy,* 2024 WL 4350328 at *11-12 (allegations of negligence damages "occurring from the loss of value of Plaintiff's IIHI [based on] the property value of personal information" sufficient to overcome motion to dismiss).

For all these reasons, Plaintiff has pled facts outlining all the elements of a plausible negligence claim, and the Court should deny Defendant's Motion to dismiss this claim.

### F. Plaintiff Pleads A Plausible Intrusion Upon Seclusion Claim

To maintain an intrusion upon seclusion claim, a plaintiff must plead four elements: "(1) an intentional intrusion; (2) upon the solitude or seclusion of the plaintiff, or his or her private affairs; (3) the intrusion was substantial; and (4) highly offensive to the ordinary reasonable person." *Kostial v. Toyota of Greensburg*, 2011 WL 6090695, *6 (W.D. Pa. Nov. 15, 2011), *citing Clegg v. Falcon Plastics, Inc*., 174 Fed. Appx. 18, 28, 2006 WL 887937 (3d Cir. Apr.6, 2006).[21] Defendant offers an array of arguments against this claim, all of which unfairly minimize or mischaracterize its actions, so do not represent a *bona fide* challenge to the sufficiency of Plaintiff's allegations. Def. Mem. at pp. 23-27 [Doc. 9-1].

#### 1. Plaintiff pleads an intentional intrusion into private communications

Defendant argues that Plaintiff "voluntarily shared the information identified in the CAC," so "Jefferson Health cannot be said to have intentionally intruded into Plaintiff's private space."

---

[21] The Restatement (Second) of Torts § 652B similarly provides: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *O'Donnell v. United States,* 891 F.2d 1079, 1083 (3d Cir.1989) ("Pennsylvania courts have consistently followed the Restatement in this area of tort law"); *Yates v. Commercial Index Bureau, Inc*., 861 F. Supp. 2d 546, 551 (E.D. Pa. 2012).

*Id.* at p. 24 [Doc. 9-1]. This argument ignores *every one* of Plaintiff's factual allegations justifying a reasonable expectation of privacy in her communications with Defendant's web properties, including Defendant's representations that:

> Jefferson Health understands that information about you and your health is very personal. Therefore, we strive to protect your privacy;
>
> We are required by law to maintain the privacy of our patients' protected health information;
>
> We will obtain your written permission when the uses and disclosures of PHI are for marketing purposes or other activities where we receive remuneration in exchange for disclosing such PHI;
>
> Should we wish to disclose your PHI in any manner that would constitute a sale of your PHI, we will obtain your written authorization to do so;
>
> You may visit our website without submitting any information about yourself. If you send us e-mail or subscribe to one of our on-line publications, you will be asked to submit information about yourself. We will use this information for replying to your message or forwarding the requested material. We do not share this information with any other partners, affiliates or members of JHS. Our website may log the IP addresses of visitors, but only to administer the site and diagnose problems with our server.

*See* Complaint at ¶¶67-71, 111-150 [Doc. 1]. Defendant's consistent representations that its web properties were places for private, safe, and secure communications about individually-identifiable health information completely undermine its current arguments to the contrary and make clear that, although Defendant's website was available to the public, it was not a true "public" forum.

Against this backdrop, Plaintiff plausibly claims a reasonable expectation that communications on Defendant's web properties would be private and confidential and alleges that Defendant intentionally intruded into her (and others') private communications on its web properties in at least three specific ways:

> by placing computer code that intercepted the characteristics and contents of communications that included individually-identifiable health information and transmitted this information to Meta without notice or consent;
>
> by using individually-identifiable health information intercepted from these communications for its own commercial purposes; and
>
> by allowing Meta to use individually-identifiable health information intercepted from these communications for its commercial purposes.

*Id.* at ¶¶3-9, 18-33, 50-64, 72-77, 81-83, 157-162, 165-169 [Doc. 1]. Rather than answering any of these allegations or – more importantly – explaining how Meta could have acquired Plaintiff's individually-identifiable health information without its involvement, Defendant simply concludes that: "the alleged intrusion was carried out by third parties." This argument is nullified both by Defendant's status as a healthcare provider with strong legal and ethical obligations to safeguard individually-identifiable health information and by Defendant's many affirmative representations that it controlled the information communicated on its web properties and would keep this information private, safe, and secure. *Id.* at ¶¶ 11-12, 66-70, 111-148, 199. Defendant cannot rationally blame Meta for its decision to place computer code on its own web properties that secretly shared individually-identifiable health information with others. Because Defendant's "intrusion by Meta" argument has no basis in the factual record, represents an offensive dereliction of Defendant's role as a healthcare provider, and is directly contradicted both by the basic functionality of the Meta Collection Tools and all its public-facing statements about the security of its web properties, the Court can confidently reject this argument.[22]

---

[22] *See e.g., In re Meta Healthcare Pixel Litig.,* 713 F. Supp. 3d 650, 655 (N.D. Cal. 2024) (denying motion to dismiss, holding "Plaintiffs' privacy claims are not foreclosed at this juncture in whole or part simply because their communications with their healthcare providers may have been through publicly available webpages… given that plaintiffs were communicating with their healthcare providers about their healthcare needs"); *Murphy,* 2024 WL 4350328 at *13 ("a website operator commits an intentional intrusion where [it] tracks plaintiffs' online behavior 'without

**2. Defendant's conduct is "highly offensive" to a reasonable person**

Defendant next argues Plaintiff has not properly pled an intrusion upon seclusion, because she: "has not alleged any conduct that is 'highly offensive' to a person with ordinary sensibilities." Def. Mem. at p. 24 [Doc. 9-1]. Defendant's argument egregiously misrepresents Plaintiff's allegations and is based mostly on a collection of outdated (1977-2006) state-court cases analyzing irrelevant non-HIPAA privacy claims. *Id.* at pp. 24-25 (citing cases involving disclosure of Google and LinkedIn browsing histories).

Plaintiff brought this action to redress Defendant's highly-offensive practice of: placing computer code on Defendant's web properties that intercepts the characteristics and contents of communications about individual patients' past, present, and future medical conditions, concerns, symptoms, appointments, providers, treatments, medications, bills, and insurance; transmitting this data to Meta for analysis; and putting the intercepted data to commercial uses benefitting both Defendant and Meta without providing any notice to, or receiving any consent from, the users of Defendant's web properties. Complaint at ¶¶ 3-9, 71-76 [Doc. 1]. Plaintiff's Complaint pleads several facts that entitle her to a finding that Defendant's conduct crosses the "highly offensive" threshold, including that *hospitals should not secretly share their patients' individually-identifiable health information with a social media company for commercial purposes*. *Id.* at ¶¶ 227-229, 244-246. Plaintiff has so clearly alleged facts adequate to support a finding of offensive conduct, that there is no rational basis to dismiss Plaintiff's privacy claim on this ground.[23] *See*

their permission to do so'"), *citing In re Nickelodeon Consumer Priv. Litig*., 827 F.3d 262, 293–94 (3d Cir. 2016).

[23] *See Cousin,* 2023 WL 4484441 at *6 (plaintiffs' allegation that disclosure of their sensitive health information on Sharp's appointment scheduling page is "highly offensive" sufficient to withstand dismissal); *Lacabe v. Oracle Inc*., 2023 WL 2838118, *7 (N.D. Cal. Apr. 6, 2023) (allegations that the defendant collected "sensitive health and personal safety information," from plaintiffs sufficient to plead a "highly offensive" intrusion); *Hazel v. Prudential Fin., Inc.,* 2023

*Doe v. Regents*, 2023 WL 3316766, *4-6 (N.D. Cal. May 8, 2023) ("Personal medical information is understood to be among the most sensitive information that could be collected about a person, and I see no reason to deviate from that norm"); *Cousin,* 702 F. Supp. 3d at 973 ("[w]hether an alleged intrusion is highly offensive to a reasonable person is an issue not capable of resolution, on these facts, at the motion to dismiss stage"); *Murphy,* 2024 WL 4350328 at *13 (rejecting "routine commercial behavior" argument because "the website stated defendant would not collect personal information [and its] status as a healthcare provider, coupled with the Privacy Policies, created an expectation of privacy that would be 'highly offensive' to breach").

**3. Plaintiff did not consent to the interception of communications containing her protected health information by "consenting to the use of Meta technologies"**

Defendant summarily concludes that all its patients consented to the disclosure of their protected health information to Meta by virtue of the "Website Privacy Policy posted on Jefferson Health's website since May 14, 2024 [that] has specifically disclosed the use of cookies and other similar technologies on the website, including disclosure of the use of Facebook technologies, which may collect information about visitor's use of the website that may be used 'for marketing purposes.'" Def. Mem. at p.26 [Doc. 9-1], *citing* Small Dec. Ex. 1 (May 14, 2024 privacy policy) *and* Small Dec. Ex. 2 (February 16, 2026 privacy policy) [Doc. 9-2]. This argument is easily refuted in two ways.

---

WL 3933073, at *5 (N.D. Cal. June 9, 2023) ("the Court is mindful of the Ninth Circuit's instruction that whether an intrusion is highly offensive is not typically a question that should be resolved at the pleading stage"); *In re Meta Pixel Healthcare Lit*., 647 F.Supp.3d at 801 ("Meta's policies forbid the transmission of health-related information, which the Ninth Circuit has found to be relevant in the "highly offensive" inquiry"); *Blackman v. Omak Sch. Dist.,* 466 F. Supp. 3d 1172, 1194 (E.D. Wash. 2020) (jury can reasonably conclude announcement that plaintiff resigned "for mental health reasons" is highly offensive to a reasonable person); *Grant v. U.S*., 2011 WL 2967323 (E.D. Cal. July 19, 2011) ("As a matter of common sense, the unwanted and unauthorized access to one's medical records by a third party is highly offensive to a reasonable person").

First, while Defendant's referenced privacy policies say cookies and pixels on its website "may collect certain information, such as device identifiers, your IP address, other unique identifiers, all of the areas within the Sites that you visit, and the length and time of the visit," they do not disclose the conduct challenged in this case: that Defendant shared with Meta individually-identifiable health information collected from patients' communications on Defendant's website about their medical conditions concerns, symptoms, appointments, providers, treatments, medications, bills, and insurance. *See e.g.,* Complaint at ¶¶ 1-14, 65-83, 145-153 [Doc. 1]. Because Defendant's Website Privacy Policy did not disclose these specific actions Plaintiff challenges, it cannot claim to have provided Plaintiff and the Class members with notice about them or secured their consent. *See* Small Dec. Ex. 1 (May 14, 2024 privacy policy); Small Dec. Ex. 2 (February 16, 2026 privacy policy) [Doc. 9-2].

Second, *In re Meta Pixel Healthcare Lit*. examined the same Facebook policies referenced in Defendant's privacy policy and squarely rejected the same argument, holding: "[Meta's] generalized notice is not sufficient to establish consent" to the disclosure of private health information. *In re Meta Pixel Healthcare Lit*., 647 F.Supp.3d at 793. In reaching this conclusion, the *meta* court held that Facebook's Terms of Use and Pixel data sharing policies did not provide a valid basis for consent, because the average person would not assume or understand that a social media company had access to their protected health information:

> I am skeptical that a reasonable user who viewed Meta's policies would have understood that Meta was collecting protected health information… *even if* a reasonable Facebook user would have understood that Meta's data collection included health information from their medical provider, that must still be squared with its representation that it 'requires' any third-party to have 'lawful rights to collect, use and share your data before providing any data to us.'

*Id.* (citations omitted). Accordingly, neither Defendant's cookie disclosure nor the Meta data sharing policy it links to, can support a conclusion that Plaintiff or the Class members consented to the interception or disclosure of their individually-identifiable health information from Defendant to Meta.

### G. Plaintiff Pleads A Plausible Unjust Enrichment Claim

As Defendant acknowledges, plaintiffs are typically allowed to assert claims in the alternative at the pleading stage. Fed. R. Civ. P. 8(d)(2)-(3). Def. Mem. at p. 27 [Doc. 9-1]. *See Solem v. Horseshoe Trail Farm, LLC*, 2022 WL 4454335, *2 (E.D. Pa. Sept. 23, 2022). However, seeking to expand application of a technicality recognized in three non-controlling (7th Circuit and Pennsylvania Superior Court) cases, Defendant urges that Plaintiff "did not plead her unjust enrichment claim in the alternative" because this claim "incorporated by reference" other factual allegations, including those relating to her contract claim. Def. Mem. at p. 28 [Doc. 9-1].

Aside from the fact this Court has never adopted or applied this hyper-technical argument, and has no reason to do so in this case, there are three more obvious reasons why Plaintiff's unjust enrichment claim should survive, all supported by controlling case-law. First, the agreements at issue govern Plaintiff's use of Defendant's web properties, but not the Parties' entire relationship (*i.e.,* the care Defendant provided as opposed to the care it promised).[24] Second, the agreements at issue do not govern all aspects of Plaintiff's claims (like Defendant's obligations under HIPAA, its use of Meta's data collection tools, or its sale of Plaintiff's individually-identifiable health

[24] *Cf.* Def. Mem. at pp. 18-20 [Doc. 9-1] *with Brand Design Co., Inc. v. Rite Aid Corp.*, 623 F. Supp. 3d 526, 538 (E.D. Pa. 2022) ("unjust enrichment may be pled in the alternative to a breach of contract claim if the contract at issue covers only a part of the relationship between the parties or if the existence of a contract is uncertain or its validity is disputed by the parties").

information).[25] Third, Defendant is presently challenging Plaintiff's contract claim and has not committed to a specific position on the existence of an agreement relevant to this claim.[26]

Defendant also challenges the sufficiency of Plaintiff's unjust enrichment damages. Def. Mem. at pp. 6, 28-31 [Doc. 9-1], *citing Adair*, 2026 WL 295744 at *11-13. Defendant suggests "Plaintiff does not have a reasonable expectation of compensation for her browsing of Jefferson Health's websites" because she has not plead facts suggesting it received a benefit that would be unconscionable for it to retain. *Id.* at pp. 28-31. Defendant levels this challenge based on an assumption that Plaintiff's unjust enrichment claim relies on "two [] theories of purported harm" that *Adair* recently held not to provide Article III standing, namely: "a diminution in value of her personal information and overpayment for services." *Id.* There are three clear flaws in this argument.

First, the Complaint actually alleges Defendant has been unjustly enriched at the expense of Plaintiff and the Class members in six ways. Defendant's Memo does not address four of these damage claims (*i.e.,* nominal damages; damages from Defendant's failure to share benefits derived from sharing and using their protected health information without consent; damages from a loss in value of their property rights; and damages from being deprived of the benefit of the bargain from their medical services agreement), so does not provide a basis to dismiss this claim either for lack of Article III standing or for a failure to plead a required claim element. *Cf.* Complaint at ¶ 201(a), (c), (e)-(f) [Doc. 1] *with* Def. Mem. at p.6, 28-31 [Doc. 9-1].

---

[25] *See, e.g., Voltarelli v. Immaculata Univ.,* 614 F. Supp. 3d 158, 167 (E.D. Pa. 2022) (allowing unjust enrichment claim where the existence of a contract is uncertain or its validity is disputed).

[26] *See, e.g., V2 Life Sols., LLC v. Aesthetics Biomedical, Inc*., 2021 WL 859427, *3 (E.D. Pa. Mar. 8, 2021) (allowing unjust enrichment claim where the defendant "has not committed to any position" about the scope or application of the contract at issue).

Second, this Court in *Opris*, a case involving personal identifiable information and protected health information on a healthcare provider's computer network, recently engaged in a detailed analysis of cases recognizing the property value of disclosed personal information and held that the plaintiffs had suffered damages relating to the "loss of value to their PII and PHI." *Opris*, 2022 WL 1639417 at *8. The reasoning and holding in *Opris* give all of Defendant's patients a reasonable expectation that their individual browsing data has value, and that they can pursue compensation in the event of its unauthorized use. Moreover, Plaintiff's Complaint is replete with facts supporting the allegation that Defendant "has unjustly retained the benefits of its unlawful and wrongful conduct." *See* Complaint at ¶14 (Defendant obtained unearned revenue from its unauthorized disclosure of patient information), ¶¶65-70 (Defendant made many public statements minimizing the scope of data collected from patients online and promising to keep individually-identifiable patient health information private), and ¶¶70-83, 150, 233 (despite its statements, Defendant collected extensive data from patients' online communications, sold this data to Meta for profit, and used this data for its own commercial purposes – all without giving notice or receiving consent to do so) [Doc. 1]. Plaintiff's Complaint, read as a whole, pleads facts suggesting how and why Defendant acted intentionally, and in secret, to gain substantial financial benefits at Plaintiff's expense, plausibly suggesting it has been unjustly enriched. *See Sheet Metal Workers Loc. 19,* 934 F.2d at 40; *Barker*, 2022 WL 4542104 at *2; *Ambrogi Food Distribution*, 595 F. Supp. 3d at 358.

Third, to the extent it relies on the similarity of facts in *Adair,* or Judge Beetlestone's legal analysis, Defendant has provided no explanation about how or why any of these things relate to Plaintiffs' claims in this case. Def. Mem. at p.6 [Doc. 9-1]. If the facts in *Adair* are similar or different in any material ways, Defendant has not said so. Nor has Defendant explained why Judge

Beetlestone held damages for diminution in value of personal information or overpayment for services did not provide the plaintiff in *Adair* case with Article III standing for an unjust enrichment claim. *Id.* (saying only "[t]he *Adair* Court's [undescribed] analysis is equally applicable here"). Where Defendant did not see fit to engage in any discussion of the facts, analysis, or holding in *Adair*, neither Plaintiff nor the Court are obliged to do so here.

For all these reasons, Plaintiff has pled facts supporting her standing to sue for unjust enrichment and pled facts sufficient to state a plausible unjust enrichment claim, meaning the Court should deny Defendant's Motion to dismiss this claim.

## IV. CONCLUSION

For all the foregoing reasons, Plaintiff respectfully asks this Court to enter her proposed Order denying Defendant's Motion to Dismiss in all respects.

Respectfully Submitted,

Dated: March 9, 2026

/s/ *David J. Cohen*
David J. Cohen
STEPHAN ZOURAS, LLC
604 Spruce Street
Philadelphia, PA 19106
(215) 873-4836

Ryan F. Stephan (*pro hac vice*)
James B. Zouras (*pro hac vice*)
STEPHAN ZOURAS, LLC
222 W. Adams Street, Suite 2020
Chicago, IL 60606
(312) 233-1550

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this date, I caused a true and correct copy of the foregoing pleading to be served on all record counsel through the Court's ECF filing system.

Dated: March 9, 2026 /s/ *David J. Cohen*